IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| BRANDY LEE VANDENBERG, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. |
| | § | |
| CITY OF GALVESTON, TEXAS; | § | 3:26-cv-00249 |
| SERGEANT LIAM BEAUMONT, | § | |
| in his individual capacity; and | § | |
| OFFICER C. ZAMORA, in his | § | |
| individual capacity, | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**
**(Jury Trial Demanded)**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff Brandy Lee Vandenberg, complaining of Defendants City of Galveston, Texas, Sergeant Liam Beaumont, and Officer C. Zamora, and for her Original Complaint would respectfully show the Court as follows:

## I.      INTRODUCTION

1.      This is a civil rights action under 42 U.S.C. § 1983 arising from a warrantless arrest made without probable cause, gratuitous excessive force inflicted on a fully restrained woman, and a malicious felony prosecution built on sworn affidavits containing material misrepresentations and omissions – including a sworn instrument that identified the person arrested by a name belonging to someone who was never there.

2.  On July 19, 2025, Plaintiff Brandy Lee Vandenberg did what any responsible adult would do: she stayed with a barefoot, unsupervised child she found wandering a hotel property after dark until his parents could be located, and her companion called 911 to report it. When the responding officer declined to identify himself and Plaintiff objected, Sergeant Liam Beaumont of the Galveston Police Department handcuffed her, informed her only afterward that she was under arrest for public intoxication, and within minutes drove her face-first into a concrete floor while her hands remained secured behind her back. After she regained consciousness, he struck her in the face with a closed fist.

3.  Ms. Vandenberg suffered a fractured left maxilla, a fractured tooth, bilateral periorbital hematomas, a fractured left tibial plateau, nerve damage resulting in foot drop, and head trauma. Officer C. Zamora stood beside Sergeant Beaumont throughout and did nothing to stop it.

4.  What the officers did next compounded what they had done. Rather than immobilize the unconscious Ms. Vandenberg and await paramedics, Beaumont and Zamora moved her limp, handcuffed body themselves. And when EMS arrived, Beaumont described the woman he had just rendered unconscious as combative and in need of a full-body restraint device – a characterization her treating trauma team would find clinically impossible, and one that followed her into the emergency room, where a triage nurse recorded, as transmitted history, that she had been brought in "after she assaulted 2 police officers."

5. Sixty-two days later, on September 19, 2025, felony arrest warrants for two counts of assault on a peace officer were issued against Ms. Vandenberg based on probable cause affidavits sworn by Sergeant Beaumont. Those affidavits, and the sworn instruments that preceded them, misidentified Ms. Vandenberg by two different names – neither of which is hers – and omitted that she was handcuffed at the moment the "controlled technique" was applied. A Galveston County Grand Jury reviewed the charges and no-billed both of them on May 13, 2026. Ms. Vandenberg has never been convicted of any offense arising from this incident.

6. Plaintiff brings individual-capacity claims against Sergeant Beaumont and Officer Zamora under the Fourth Amendment for unreasonable seizure, excessive force, failure to intervene, and malicious prosecution; a Fourteenth Amendment claim against both officers for deliberate indifference to her serious medical needs; a First Amendment retaliation claim against Sergeant Beaumont; and a municipal-liability claim against the City of Galveston under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The customs on which the municipal claim rests are not pleaded on speculation. They are documented in a published opinion of this District, *Backe v. City of Galveston*, 2 F. Supp. 3d 988 (S.D. Tex. 2014); in the Galveston Police Department's own civil service disciplinary records; in a pending felony prosecution of a former Galveston officer; and in a succession of similar incidents and federal lawsuits in the years – and, in one instance, the days – immediately preceding the violation of Plaintiff's rights.

7. Plaintiff also brings Texas common-law claims against the individual Defendants

in the alternative.

## II.   JURISDICTION AND VENUE

8.   This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the Constitution and laws of the United States.

9.   This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367 because those claims arise from the same case or controversy as the federal claims asserted herein.

10.   Venue is proper in this District under 28 U.S.C. § 1391(b) because all of the events giving rise to Plaintiff's claims occurred in Galveston County, Texas, within the Southern District of Texas, and this action is properly assigned to the Galveston Division because the events occurred within that division.

## III.   PARTIES

11.   Plaintiff Brandy Lee Vandenberg is an individual and a resident of the State of Texas.

12.   Defendant City of Galveston, Texas is a municipal corporation organized under the laws of the State of Texas, and may be served with process through its City Manager, Brian Maxwell, 823 25th Street #203, Galveston, Texas 77550, or wherever he may be found.

13.   Defendant Sergeant Liam Beaumont was at all relevant times a sworn peace officer employed by the Galveston Police Department, acting within the course and scope of that employment and under color of state law. He is sued in his individual capacity and may be served at his place of employment, 601 54th Street, Galveston,

Texas 77551, or wherever he may be found.

14.    Defendant Officer C. Zamora was at all relevant times a sworn peace officer employed by the Galveston Police Department, acting within the course and scope of that employment and under color of state law. He is sued in his individual capacity and may be served at his place of employment, 601 54th Street, Galveston, Texas 77551, or wherever he may be found.

## IV.    FACTUAL ALLEGATIONS

### A. Ms. Vandenberg Calls 911 to Protect an Unattended Child

15.    On the night of July 19, 2025, Plaintiff was staying with her companion at the Holiday Inn Resort Galveston, 5002 Seawall Blvd., Galveston, Texas.

16.    Plaintiff observed a barefoot child wandering the hotel property, unsupervised, late at night.

17.    Concerned for the child's safety, Plaintiff remained with the child while her companion called 911 to report the situation and summon assistance.

18.    Sergeant Beaumont, working an extra-duty security assignment in the area, responded to the sixth floor of the Holiday Inn in connection with an unrelated matter and initially passed Plaintiff and the child in the hallway without incident.

19.    Beaumont, together with a hotel security employee, then sought to take custody of the child and remove him from Plaintiff's presence before the child's parents had been located. Neither Beaumont nor the security employee properly identified himself, despite Plaintiff's requests that they do so.

20.    Plaintiff – a mother of three – was unwilling to surrender an unattended child to men

who refused to identify themselves, and she said so. Her objection was verbal only, and it was precisely the caution any reasonable parent would exercise before releasing a child to strangers.

21.    Plaintiff's objection visibly angered Beaumont. Although Beaumont knew or soon learned that Plaintiff and her companion were the 911 callers who had reported the unattended child, he did not treat the call for what it was – a citizen protecting a vulnerable child until help arrived. He treated Plaintiff's protective objection as a challenge to his authority.

### B. *Beaumont Seizes and Arrests Plaintiff Without Probable Cause*

22.    Plaintiff was not intoxicated to a degree that endangered herself or others, was not engaged in disorderly conduct, and did not create any public-safety risk.

23.    Plaintiff was not armed, was not fleeing, and posed no immediate threat to herself, to officers, or to any other person.

24.    When Plaintiff again asked Beaumont to identify himself, Beaumont again did not do so. Instead, he told her words to the effect of, "You're about to go to jail," and seized her, handcuffing her hands behind her back.

25.    Only after Plaintiff had already been seized and handcuffed did Beaumont inform her that she was under arrest for public intoxication.

26.    The seizure followed immediately upon, and in response to, Plaintiff's verbal objections to the removal of the child and her requests that Beaumont identify himself – protected speech that cannot supply probable cause for any offense. *City*

*of Houston v. Hill*, 482 U.S. 451, 461–63 (1987).

27. Whatever Plaintiff's level of alcohol consumption on the night of July 19, 2025, Beaumont lacked probable cause to arrest her for public intoxication. Texas Penal Code § 49.02 requires both that a person be intoxicated and that she "may endanger the person or another." At the moment Beaumont seized Plaintiff, she was standing in a hotel corridor with her companion, having called 911 to report an unattended child and waited with that child for a responsible party to respond. She was not stumbling, falling, threatening anyone, or otherwise presenting any observable risk of self-harm or harm to others. Her arrest was not supported by probable cause for the endangerment element of § 49.02, and Beaumont's announcement of the PI charge – made only after she was already handcuffed – demonstrates that no probable-cause assessment specific to that element occurred before the seizure.

### C. The Handcuffed Takedown and Its Immediate Aftermath

28. Officer Zamora joined Beaumont as he began to escort the handcuffed Plaintiff toward the elevators.

29. Plaintiff, still restrained, verbally protested her treatment. She did not strike, kick, or otherwise assault either officer at any point before the force described below was used against her.

30. In frustration at being handcuffed and denied an explanation, Plaintiff said words to the effect of, "go ahead and hurt me."

31. Beaumont responded, "I'll do that," and immediately executed a forceful takedown maneuver that drove Plaintiff – hands still cuffed behind her back, with no ability

to brace or protect herself – face-first into the concrete floor beside the elevators. The body-worn cameras of both Beaumont and Zamora captured this exchange on audio.

32.　A person whose hands are secured behind her back cannot cushion, brace for, or otherwise control the manner in which she strikes the ground. At the moment of the takedown, Plaintiff was handcuffed, flanked by two officers, and offering no physical resistance; she posed no physical threat to Beaumont, Zamora, or anyone else.

33.　Plaintiff immediately screamed and lost consciousness.

34.　Beaumont radioed for EMS. His radio transmission identified the person with a head injury as the suspect – the woman he had just slammed onto the concrete floor.

35.　Standard emergency medical protocol requires that a person who has sustained or may have sustained a head or spinal injury not be moved until emergency medical personnel arrive with cervical stabilization equipment. That standard is written down. Texas spinal motion restriction guidance issued by the Texas Department of State Health Services through the Governor's EMS and Trauma Advisory Council (GETAC), consistent with the national consensus position of the National Association of EMS Physicians, the American College of Surgeons Committee on Trauma, and the American College of Emergency Physicians, requires that suspected head, neck, or spinal injury be managed with spinal motion restriction – maintaining the head, neck, and torso in neutral alignment, minimizing unnecessary patient movement, and immobilizing the patient in the position found when neutral

alignment cannot safely be achieved. Moving a person with an unknown spinal injury risks converting a survivable injury into permanent paralysis or death. Beaumont and Zamora each watched Plaintiff strike the concrete floor face-first with force sufficient to render her unconscious; each therefore knew the facts from which the risk of head or spinal injury was apparent.

36. Notwithstanding this known risk, Beaumont and Zamora did not wait for EMS. Instead, they moved Plaintiff's unconscious, handcuffed body – handling her by her restrained arms – and placed her in the elevator for transport to the ground floor. She remained incapacitated throughout this transport.

37. The officers' own department had reduced these precautions to written policy. On information and belief, Galveston Police Department Policy 429 (Medical Aid and Response), in effect on July 19, 2025, directed that "[e]xcept in exceptional cases where alternatives are not reasonably available, members should not transport persons who are unconscious, who have serious injuries or who may be seriously ill," Policy 429.4; directed members to "stabilize the scene whenever practicable while awaiting the arrival of EMS," Policy 429.3; and recognized an "altered level of consciousness" as a life-threatening symptom requiring an immediate EMS response, Policy 429.10. No exceptional circumstance prevented Beaumont and Zamora from waiting minutes for paramedics. They moved her anyway.

38. Officer Zamora's physical participation in moving Plaintiff's unconscious body was not a passive failure to act – it was an affirmative act that placed Plaintiff at independent risk of aggravated spinal or cervical injury. GPD Policy 429.4

expressly prohibits officers from transporting unconscious persons except in exceptional cases where alternatives are not reasonably available. No such exceptional circumstance existed: EMS had been called and could have been awaited at the scene. Zamora's decision to physically handle an unconscious trauma patient before trained personnel arrived, in direct violation of that policy, constitutes an independent affirmative harm to Plaintiff distinct from his bystander failure during the force itself.

39. Beaumont's own department's written Use of Force policy requires supervisory notification as soon as practicable when "the individual subjected to the force was rendered unconscious," Policy 300.5.1(g), and separately requires that persons receiving medical custody be informed of the force used and any potential safety or medical risks to the subject. Policy 300.6. Neither obligation was fulfilled before Plaintiff was moved.

### D. The Closed-Fist Strike

40. After Plaintiff regained consciousness – disoriented, injured, and still restrained – she cried out, "Why are you squeezing me so hard? What are you afraid of?" Beaumont responded by striking her in the face with a closed fist. The body-worn cameras of both officers captured Plaintiff's words in the moments before the strike.

41. At the time of the strike, Plaintiff was handcuffed, had already lost consciousness once from the takedown, and had already sustained the confirmed injuries described below. She was not resisting in any manner that justified further force, let alone a closed-fist blow to an already injured face.

42. Plaintiff screamed loudly after the strike. The screaming was captured on the body-worn camera audio of both officers. It was the second time that night she could be heard screaming – once after the takedown drove her into the concrete floor, and again after Beaumont's fist connected with her already-fractured face while her hands remained cuffed behind her back.

43. Officer Zamora was present for the entire use-of-force sequence. He joined Beaumont before the escort toward the elevators began, was within arm's reach of Beaumont during the takedown, participated in moving Plaintiff's unconscious body into the elevator, and was standing beside Beaumont when Beaumont struck Plaintiff's face with a closed fist after she regained consciousness. The takedown and the closed-fist strike were separate applications of force, separated by minutes that included the elevator transport to the ground floor. At no point in that interval did Zamora restrain Beaumont, place himself between Beaumont and Plaintiff, summon a supervisor, or speak a word of de-escalation. Zamora accordingly had a realistic opportunity to prevent at least the second application of force against a handcuffed, injured woman, and he failed to do so.

### E. EMS Response and Transport to UTMB

44. When Galveston EMS personnel responded, Beaumont did not tell them what he had done. On information and belief, based on the body-worn camera audio, the official incident report, and the UTMB medical record, Beaumont described Plaintiff to EMS personnel as combative and in need of a WRAP full-body restraint device. He did not relay that Plaintiff had been driven face-first into a concrete floor

while handcuffed, that she had lost consciousness at the scene, or that he had struck her face with a closed fist after she regained consciousness.

45.   EMS personnel, acting on the information transmitted to them, applied the WRAP full-body restraint device before transport and administered a chemical restraint protocol – midazolam (Versed) 5mg, haloperidol (Haldol) 5mg, and diphenhydramine (Benadryl) 50mg, each by intramuscular injection – a protocol used for combative or dangerously agitated patients.

46.   Plaintiff was not combative. She could not have been. On arrival at UTMB she was moaning, unable to follow commands, and scored 11 on the Glasgow Coma Scale – a significantly depressed level of consciousness. A person in that condition is neurologically incapacitated, not agitated; the two clinical presentations are mutually exclusive. The Department's own Policy 429.3 required Beaumont to report "whether the person is conscious, breathing and alert" – she was not – and asked separately whether the person was showing "signs or symptoms of excited delirium or other agitated chaotic behavior." Beaumont invoked the second category for a woman who was in the first, directing the clinical management of a head-trauma patient toward a combativeness protocol while withholding the mechanism of her injuries.

47.   The false characterization traveled with her. The UTMB triage nurse recorded, as history transmitted through the EMS handoff, that Plaintiff was brought in "after she assaulted 2 police officers." That notation – entered into Plaintiff's medical record within hours of the takedown, while she remained unable to communicate –

originated with Beaumont, not with any independent observation by EMS or hospital personnel. It is the earliest documented instance of the false narrative that would culminate, sixty-two days later, in the felony affidavits described below.

48. Galveston Emergency Medical Services transported Plaintiff by ambulance to the University of Texas Medical Branch Emergency Department (UTMB-ED), 301 University Blvd., Galveston, Texas 77555. She arrived at 12:24 AM on July 20, 2025, moaning, unable to follow commands, and in a full-body restraint device. Attending emergency physician Dr. Gregory E. Rumph upgraded her care to a full trauma activation within minutes of arrival due to unknown loss of consciousness, depressed Glasgow Coma Scale score of 11, and obvious head trauma. UTMB nursing staff applied a cervical collar at 12:38 AM – fourteen minutes after arrival – precisely the immobilization measure that should have preceded any movement of Plaintiff at the scene. Plaintiff was hospitalized until 5:49 PM on July 21, 2025.

49. Neither Beaumont nor Zamora fulfilled the independent obligation imposed by GPD Policy 429.3 to provide EMS personnel with an accurate account of the nature of the incident, Plaintiff's observed signs and symptoms, or her loss of consciousness at the scene. Zamora was present during the takedown, witnessed Plaintiff lose consciousness, and physically handled her unconscious body. His failure to correct Beaumont's characterization of Plaintiff as combative – or to independently ensure that EMS received an accurate description of the mechanism of injury and the force that caused it – was an independent omission that contributed to the clinical mismanagement that followed. The chemical restraint protocol EMS administered

before transport – Versed 5mg IM, Haldol 5mg IM, and Benadryl 50mg IM, indicated for a combative or agitated patient – was applied to a person with a GCS of 11 secondary to head trauma, a risk that accurate reporting by either officer could have prevented.

### F. *Plaintiff's Injuries – Confirmed by UTMB Medical Records*

50.    Plaintiff's treating physicians at UTMB documented the following injuries, each confirmed by imaging, clinical examination, or specialist consultation during her hospitalization of July 20–21, 2025 (MRN 879539A, Encounter No. 126970518):

51.    **Head and face.** Left frontal scalp contusion and hematoma. Bilateral periorbital hematomas – left and right, documented by CT and trauma surgery examination. Moderate left periorbital subcutaneous emphysema. Nondisplaced fracture of the frontal process of the left maxilla, confirmed on final CT read and in the ENT consultation by Dr. Tyler Janz, M.D. (Otolaryngology-Head & Neck Surgery). Nasal septal deviation to the left, identified on final CT. Fractured left second premolar, confirmed by ENT consultation and included in the discharge diagnosis. Laceration at the left lateral brow, treated with mupirocin (Bactroban) ointment.

52.    **Neurological.** Loss of consciousness at the scene following the takedown, confirmed in the orthopedic consultation record. Glasgow Coma Scale of 11 on trauma activation, with inability to follow commands. Plaintiff was unable to communicate adequately with treating personnel on arrival.

53.    **Left lower extremity – fracture and nerve injury.** Intra-articular lateral tibial plateau fracture with lipohemarthrosis, confirmed by left knee x-ray (impression:

"lateral tibial plateau fracture and lipohemarthrosis") and left tibia/fibula CT (impression: "intra-articular lateral tibial plateau fracture, large joint effusion, impacted fracture of the lateral tibial plateau with intra-articular extension"). Common peroneal nerve palsy with resultant foot drop, confirmed in the orthopedic progress note of July 21, 2025, which assessed "left lateral tibial plateau fracture s/p altercation with common peroneal nerve palsy," and by physical therapy evaluation documenting 0/5 strength in tibialis anterior and extensor hallucis longus, decreased sensation to the dorsal surface of the left foot, and a foot-drop gait pattern. Plaintiff was discharged non-weight-bearing on the left lower extremity with a hinged knee brace and a left ankle-foot orthosis (AFO).

54. **Bilateral arm ecchymosis.** Ecchymosis (bruising) of both arms, documented in the trauma surgery history and physical examination, consistent with physical handling of Plaintiff's restrained arms during the events described above.

55. Plaintiff's own words to her treating physician confirm the mechanism: in the orthopedic surgery consultation, Plaintiff stated, "I remember being body slammed." That statement appears in the UTMB medical record and is independently consistent with Beaumont's own recorded statement, "I'll do that," and the body-worn camera audio of both officers.

56. Plaintiff required a full trauma activation, multiple specialist consultations (Trauma Surgery, Otolaryngology/Head & Neck Surgery, Orthopedic Surgery, Physical Therapy, Care Management), and a 41-hour hospitalization. She was discharged with a rolling walker, a hinged knee brace, a left AFO, prescription pain

medications, and oral rinse for the jaw injury, with follow-up appointments with three separate specialties. A representative photograph of Plaintiff's injuries is attached as Exhibit C, and additional photographs depicting Plaintiff's injuries are collected in Exhibit D.

### G. *The Body-Camera Failure and the Reports That Followed*

57.    Beaumont's body-worn camera recorded audio throughout the encounter but failed to capture video for approximately the first fifty minutes – precisely the period encompassing the handcuffing, the takedown, and the closed-fist strike.

58.    Beaumont's own incident report attributes this failure to the camera being improperly seated in his vest and describes the malfunction as a "common occurrence."

59.    The official reports of the incident were reviewed and approved by Galveston Police Department supervisors notwithstanding facial defects. Officer Zamora's supplemental report – which identifies the person the officers arrested by a name that is not Plaintiff's, throughout – was reviewed and approved by Sergeant S. Childs within approximately one hour of its submission. Beaumont's later supplement correcting the spelling of Plaintiff's name was reviewed and approved by Sergeant T. Hennington.

### H. *The Felony Warrants, Issued Sixty-Two Days Later, on Affidavits That Misidentified Plaintiff*

60.    Rather than book Plaintiff into jail on the night of the incident, officers left her at the hospital under medical care while felony charges were pursued by warrant.

61.    The misdemeanor public-intoxication affidavit Beaumont swore out the following day, July 20, 2025, identified the arrestee not as Brandy Lee Vandenberg, but as a different name belonging to a person who was not present at the Holiday Inn Resort and who is not a party to any proceeding arising from this incident.

62.    Officer Zamora's own supplemental report of the same encounter, filed July 20, 2025, likewise identifies the person the officers arrested by a name that is not Plaintiff's. By filing a report that misidentified the arrestee – on an encounter in which Zamora was physically present, in which he personally handled Plaintiff's unconscious body by her restrained arms, and in which he had no legitimate basis for confusion about the identity of the person arrested – Zamora made an independent contribution to the false documentary record that preceded and supported the subsequent felony prosecution.

63.    It was not until September 19, 2025 – sixty-two days after the incident – that felony arrest warrants for two counts of assault on a peace officer were issued against Plaintiff, based on probable cause affidavits sworn by Beaumont that, for the first time, corrected her name.

64.    The affidavits supporting those felony warrants omitted that Plaintiff was handcuffed behind her back at the moment of the takedown, omitted that she lost consciousness as a direct result of that takedown, and omitted the extended failure of Beaumont's own body camera during the very events the affidavits purported to describe.

65. Beaumont caused the institution of felony criminal proceedings against Plaintiff through sworn instruments that he knew, or was recklessly indifferent to the fact, misidentified the person arrested and omitted material facts bearing directly on whether the force used against her was justified.

66. Any probable-cause determination made by a magistrate or grand jury on the basis of those affidavits was tainted by Beaumont's material misrepresentations and omissions, and any presumption that the intermediary's deliberations were independent of Beaumont's own conduct is overcome for that reason. See *Hand v. Gary*, 838 F.2d 1420, 1427–28 (5th Cir. 1988) ("[a]ny misdirection of the magistrate or the grand jury by omission or commission perpetuates the taint of the original official behavior"); *Winfrey v. Rogers*, 901 F.3d 483, 493–97 (5th Cir. 2018); *Melton v. Phillips*, 875 F.3d 256, 264 (5th Cir. 2017) (en banc).

### I. *Favorable Termination*

67. Both felony charges – Cause Nos. 25-CR-3867 and 25-CR-3869 – were presented to a Galveston County Grand Jury, which no-billed both charges on May 13, 2026. See Exhibit A (No-Bill Closure Notice, Cause No. 25-CR-3867); Exhibit B (No-Bill Closure Notice, Cause No. 25-CR-3869).

68. Plaintiff has never been convicted of any offense arising from the July 19, 2025 incident.

69. The no-bill of both felony charges constitutes a favorable termination of the criminal proceedings against Plaintiff for purposes of her Fourth Amendment malicious-prosecution claim. *Thompson v. Clark*, 596 U.S. 36, 49 (2022).

### J. The Galveston Police Department's Written Use-of-Force and Medical Aid Policies

70.   The Galveston Police Department maintains a written Use of Force policy (Policy 300) governing every officer's conduct, including Beaumont's and Zamora's conduct on July 19, 2025. That policy establishes the Department's own internal standard against which the conduct described above is properly measured, independent of and in addition to the constitutional standard.

71.   The policy requires that, in evaluating the reasonableness of force, an officer consider, among other factors, "the degree to which the individual has been effectively restrained and his/her ability to resist despite being restrained," and "whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the officer or others." Policy 300.3.2(h), (p).

72.   The policy directs that, "[w]hen circumstances reasonably permit, officers should use non-violent strategies and techniques to decrease the intensity of a situation, improve decision-making, improve communication, reduce the need for force, and increase voluntary compliance." Policy 300.3.5.

73.   The policy imposes an affirmative duty on any officer present who observes another officer "using force that is clearly beyond that which is objectively reasonable under the circumstances" to "intercede to prevent the use of unreasonable force," and separately requires any officer who observes force "potentially beyond that which is objectively reasonable" to "report these observations to a supervisor as soon as feasible." Policy 300.2.1. This reporting duty is independent of, and in addition to,

the duty to intervene.

74. The policy requires that "[a]ny use of force by a member of this department shall be documented promptly, completely, and accurately," with the officer required to "articulate the factors perceived and why he/she believed the use of force was reasonable under the circumstances." Policy 300.5.

75. The policy mandates supervisory notification "as soon as practicable" following any application of force where, among other triggers, "[t]he individual subjected to the force was rendered unconscious" or "[a]n individual was struck or kicked." Policy 300.5.1(g)–(h). Both triggers were present here: Plaintiff was rendered unconscious by the takedown, and she was struck with a closed fist.

76. The policy requires that the on-scene supervisor or handling officer "ensure that any person providing medical care or receiving custody of a person following any use of force is informed that the person was subjected to force," including "a description of the force used and any other circumstances the officer reasonably believes would be potential safety or medical risks to the subject." Policy 300.6.

77. The policy requires a supervisor responding to a reported use of force to, among other duties, "[r]eview and approve all related reports" and "[e]valuate the circumstances surrounding the incident and initiate an administrative investigation if there is a question of policy noncompliance." Policy 300.7(f)–(h). The policy separately assigns the Watch Commander responsibility to "review each use of force by any personnel within his/her command to ensure compliance with this policy and to address any training issues." Policy 300.7.1.

78. The policy commits the Department to periodic officer training on "[g]uidelines regarding vulnerable populations" and "[d]e-escalation tactics, including alternatives to force." Policy 300.8.

79. The policy requires that, "[a]t least annually, the Office of Professional Standards in coordination with the Compliance Supervisor" prepare an analysis report on use-of-force incidents, identifying "trends in the use of force by members" and "[t]raining needs recommendations," and that this report "be submitted to the Chief of Police." Policy 300.9. Chief Balli commanded the Office of Professional Standards before becoming Chief in October 2021, and has received the reports the policy requires since. The trend of underreported and undertrained force described in Section IV.K below was accordingly a matter the Department's own policy required to be brought to the Chief's personal attention, on a recurring basis, independent of any single incident.

80. The Department also maintains a written Medical Aid and Response policy (Policy 429) which, on information and belief, was in effect on July 19, 2025. That policy requires a member requesting EMS to provide information for relay to EMS personnel, including "the nature of the incident" and the person's signs and symptoms, among them "whether the person is conscious, breathing and alert" and "whether the person is showing signs or symptoms of excited delirium or other agitated chaotic behavior." Policy 429.3. It directs members to "stabilize the scene whenever practicable while awaiting the arrival of EMS," and not to direct EMS personnel whether to transport the person for treatment. Policy 429.3. It prohibits

members, "[e]xcept in exceptional cases where alternatives are not reasonably available," from transporting "persons who are unconscious, who have serious injuries or who may be seriously ill." Policy 429.4. And it recognizes an "altered level of consciousness" as a life-threatening symptom requiring an immediate EMS response. Policy 429.10.

81. Beaumont and Zamora departed from each of these directives: they moved an unconscious woman rather than stabilizing the scene; Beaumont withheld from EMS the nature of the incident and Plaintiff's true condition; and he substituted for the disclosures the policy required a characterization – combative – belonging to a clinical category the policy itself distinguishes from unconsciousness. These are not judgment-laden standards over which reasonable officers could differ. Policy 429.4 is a categorical directive, and Policy 429.3's disclosure requirements are a checklist.

82. As set forth in the sections that follow, Beaumont's and Zamora's conduct – and the conduct of the Department more broadly – departed from these written requirements in ways that were neither isolated nor unforeseeable.

### K. The Galveston Police Department's Documented Customs of Force Against Restrained Persons and of Underreporting Force

83. The conduct described above was not an aberration. It was the product of two longstanding, mutually reinforcing customs within the Galveston Police Department, each documented in judicial opinions, in the Department's own civil service disciplinary records, and in a succession of similar incidents preceding July 19, 2025: (1) a custom of using excessive force against restrained or non-threatening

persons, and (2) a custom of underreporting, misreporting, and failing to record uses of force, which conceals the first custom from scrutiny and assures officers that force against restrained persons carries no professional consequence.

### L. *The H2O incident and this District's findings in Backe*

84. On October 5, 2008, Galveston Police officers responding to a wedding reception at the San Luis Hotel's H2O bar used force against numerous attendees. The resulting federal litigation produced a published opinion of this District denying summary judgment to the City on municipal-liability claims. *Backe v. City of Galveston*, 2 F. Supp. 3d 988 (S.D. Tex. 2014) (denying the City of Galveston summary judgment on *Monell* claims based on police department customs of excessive force and of underreporting and underinvestigating force).

85. The *Backe* court found evidence sufficient for a jury to conclude that the Department operated under a pervasive culture of underreporting and underinvestigating uses of force. The summary-judgment record included the incoming police chief's acknowledgment that the department he inherited in 2008 was 'plagued with activities that oftentimes were illegal, most of the time unethical,' *Id.* at 991, and evidence that the chief himself understood that deficient reporting and review of force can 'facilitate, mask, and even encourage' excessive force. *Id.* at 1006. The court appended a chart cataloguing uses of force at the H2O incident that went unreported, self-unreported, or undocumented on required use-of-force forms.

86. Among the officers whose conduct is recounted in the *Backe* summary-judgment record is Officer Douglas Balli. As credited by the court, that record included

evidence that after arrestee Gil O'Balle had been taken to the ground and handcuffed, Officer Balli picked up his head by the hair, pulled his glasses down, and pepper-sprayed his face on both sides; and that Officer Balli pepper-sprayed a second man, Mr. Trevino, in the face after Trevino had gone to the ground and put his hands up. Both of Officer Balli's OC-spray deployments appear in the court's appendix of force marked by reporting deficiencies; per the opinion, the spray used on Trevino appeared in no officer's initial report apart from one supervisor's oblique reference to "overspray."

87.  Douglas Balli was not separated from the Department for this conduct. He rose through its ranks – including service as Commander of the Department's Office of Professional Standards, the unit responsible for internal discipline – and in October 2021 became Chief of Police. He was the Department's Chief, and the City's final policymaker for law enforcement, on July 19, 2025.

### M. The City's own disciplinary file on Lieutenant Joel Caldwell

88.  The supervisory officer disciplined for the use-of-force reporting failures at the H2O incident remained in Galveston Police Department command for the next decade and a half, accumulating a disciplinary record – maintained by the City itself in its civil service files – that documents the persistence of the underreporting custom at the supervisory level.

89.  In March 2009, the Department issued a written statement of suspension for ten working days against then-Lieutenant Joel Caldwell (Discipline No. 08-0066, "Failure to Supervise (H2O)"), citing use-of-force reports that "were not completed

or were completed inaccurately," a failure to adequately manage and supervise personnel, and a "leadership failure." The written findings stated that the reporting failures had "jeopardized cases," "damaged community trust," and compromised "the integrity and credibility of the GPD." Caldwell accepted a reduced penalty of three working days without pay. He was not terminated.

90.    In October 2013, the Department suspended Caldwell for eight days (Discipline No. 13-0030) for an unauthorized restraint technique used on Cherise Ramirez, a public-intoxication arrestee, during booking, combined with failure to complete a required use-of-force report for that incident. Caldwell admitted using a "higher level hold than needed" before redirecting to a lesser hold. The Chief's written disciplinary statement warned that "no further behavior of this kind will be tolerated and will call for his immediate termination if exhibited," and directed Caldwell to complete a three-month employee improvement plan.

91.    It was exhibited. The August 2023 discipline (Discipline No. 23-2857, 23-2872, 23-2873) encompassed three incidents. Incident 23-2857 arose on February 25, 2023, when Caldwell, as Watch Commander, failed to inform the crash scene investigator and failed to ensure required documentation when a patrol unit under his command ran over a deceased body in the roadway. Incident 23-2872 arose on March 11, 2023, when Caldwell deployed a Byrna launcher – a pepper-ball projectile system – twice against a motorcyclist on Seawall Boulevard during a traffic stop, but his use-of-force report recorded only one deployment and misidentified the weapon as "OC Spray" rather than the Byrna launcher. There is no supplemental report for

either deployment. Critically, Lieutenant Caldwell failed to activate his WatchGuard body camera during both use-of-force incidents as required by policy – a documented, City-acknowledged camera failure by a supervisory officer during uses of force, twenty-nine months before Beaumont's camera failure during the force used against Plaintiff. Incident 23-2873 arose on March 17, 2023, when Caldwell arrested three men – including a journalist who was recording – for impeding the sidewalk, without first providing the required ordinance notification. Notwithstanding the 2013 written warning that repetition of unauthorized force and reporting violations would result in immediate termination, Chief Balli – the same officer whose own unreported OC-spray deployments appear in the *Backe* appendix – imposed a fourteen-day suspension in August 2023. Caldwell waived his appeal and was retained in supervisory command.

### N. *Rebmann v. City of Galveston – documented force against a citizen exercising First Amendment rights, confirmed in this District's judicial record*

92. The custom of force triggered by a citizen's protected speech is independently documented in *Rebmann v. City of Galveston*, No. 3:24-cv-00155 (S.D. Tex.), a federal civil rights action by a Galveston-area resident who records police activity and publishes it, arising from three separate incidents between June 2022 and March 2023 in which Galveston officers used force against or arrested him in direct response to his recording and verbal challenges. This Court's November 2024 order ruling on a partial motion to dismiss recited the incident allegations in detail, and those allegations, together with the operative complaint in that action, are part of the

judicial record of this District.

93. **June 1, 2022 – Boat ramp incident.** As the plaintiff began recording officers responding to a call near a boat dock, Officer Franklin shined a flashlight at his camera, ordered him to leave without explanation, and, when he did not immediately comply, tackled him and struck him in the back of the head with handcuffs while handcuffing him. Sergeant Doraty, Franklin's supervisor, was present and did not intervene. The plaintiff was taken to jail but never charged with any offense arising from that encounter.

94. **January 1, 2023 – Caldwell driveway incident.** Lieutenant Caldwell was seated in a patrol vehicle parked near the plaintiff's residence. When the plaintiff began recording from his own driveway and approached the vehicle to ask what was happening, Caldwell's demeanor changed immediately – described in the complaint as shifting from jovial to aggressive – and the encounter escalated into Caldwell deploying OC spray directly into the plaintiff's eyes, striking him with a taser, and using a leg-sweep or strike that drove the plaintiff's face into the gravel, after which Caldwell continued to strike the plaintiff's face while he was on the ground. This occurred after the plaintiff began filming and while he was standing on his own property. Caldwell arrested him.

95. **March 17, 2023 – Third incident.** When the plaintiff began filming Caldwell making an arrest and asking bystanders to move, Caldwell shined a flashlight into his camera and arrested two other journalists for impeding the sidewalk. When the plaintiff began filming those arrests, Caldwell arrested him as well, for impeding

the sidewalk and public intoxication. The plaintiff alleges that Caldwell was later suspended for abuse of office and for violating the plaintiff's rights in connection with this encounter – a fourth disciplinary entry for Caldwell, and the first for conduct that is itself a civil rights violation rather than a reporting deficiency.

96. The factual record in *Rebmann* is probative here on three independent grounds. First, it confirms the speech-triggered force custom through a third plaintiff and a different set of incidents spanning the same time period as Caldwell's 2023 force and reporting violations. Second, it documents Lieutenant Caldwell personally as a repeated actor in that custom – not merely a supervisor who failed to report others' force, but an officer who himself used OC spray, a taser, and a continued attack that pounded his face into the gravel, on a citizen filming from his own driveway, months before Chief Balli chose suspension over termination for Caldwell's reporting violations. Third, the March 2023 arrest of journalists recording an arrest without required ordinance notification – one of the three incidents in the 2023 discipline – demonstrates that the City had direct, incident-specific notice that Caldwell was a constitutional risk to citizens' speech and assembly rights, yet retained him in supervisory command through the *Hardman* entry in June 2024. Note: the *Rebmann* court dismissed the municipal liability claim in that case in November 2024 as insufficiently pleaded, consistent with the specificity this District requires; the individual officer claims remain live. Plaintiff does not rely on *Rebmann* for a *Monell* holding but for the independently relevant incident facts recited in this

Court's own order, and for the notice those facts provide to the City of a recurring custom.

## M. The custom's continuation: 2021 through July 2025

97.     Between 2021 and 2025, Galveston Police officers repeatedly arrested Layla O'Brien – an indigent Galveston resident with impaired vision who must travel on foot – for "walking in the roadway," conduct Texas law expressly permits where sidewalks are unavailable or unusable. Those prosecutions were uniformly dismissed. On May 13, 2022, after Ms. O'Brien verbally objected to accusatory questioning by responding officers, Officer Eguis announced "First of all, we're gonna cut that out" and took her to the ground, joined by Officer Jared Rivas, with Officer Bilbrey assisting. The encounter was captured on video. No officer is known to have been disciplined for it.

98.     On July 1, 2023, Rivas responded to a complaint about dogs barking at a civil rights fundraiser at 2627 Ave. M, Galveston. When Craig Bowie disputed Rivas's allegation that the dogs lacked water – an allegation Rivas's own body camera footage refuted, showing the dogs had water, and capturing a neighbor who confirmed that Bowie had been checking on the dogs throughout the day – Rivas immediately pushed Bowie to the ground, choked him, punched and kicked him, dragged him to his patrol vehicle, and slammed his head into the patrol car window twice. Before any investigation, Rivas told Bowie he was "going to jail now for animal cruelty." Bowie was charged with animal cruelty and resisting arrest, spent twenty-eight hours in custody, and posted a $5,000 bond. On December 6, 2023, the

Galveston County District Attorney dismissed all charges. That dismissal – occurring seven months before the Island Bay incident – placed the City on direct, formal notice that Rivas had effected a false arrest whose lack of probable cause his own body camera had already established. No disciplinary action against Rivas for the Bowie incident is known to have followed. The incident is the subject of pending federal civil rights litigation in this District. *Bowie v. City of Galveston*, No. 3:25-cv-00187 (S.D. Tex. filed June 16, 2025).

99.   On June 16, 2024, Galveston Police officers – including Lieutenant Caldwell as supervising officer and Sergeant Hennington – forced warrantless entry into a family home and deployed tasers, chemical agents, and pepper-ball rounds against its occupants, including in proximity to young children. When an elderly occupant asked Lieutenant Caldwell for his name and badge number, Caldwell responded by seizing him by the neck. That incident is the subject of pending federal civil rights litigation against the City in this District. *Hardman v. City of Galveston*, No. 3:26-cv-00393 (S.D. Tex.). No body-worn camera footage from Lieutenant Caldwell depicting the violence inside the residence has been produced; the Caldwell footage that does exist begins only after the fact, depicting his transport and booking of the elderly occupant. Thirteen months later, the video record of the force used against Plaintiff would be missing in the same way. And Sergeant Hennington – a defendant in the *Hardman* action – is the supervisor who reviewed and approved Beaumont's supplemental report in Plaintiff's case.

100.   Nine days after the *Hardman* entry, on June 25, 2024, Officer Jared Rivas – the

same officer who had used force against Ms. O'Brien in 2022 and had been found by the Galveston County District Attorney to have made a false arrest in 2023, without any discipline either time – confronted two families at the Island Bay Resort pool while working as a courtesy officer, displaying his badge and acting under color of law. Rivas physically assaulted multiple attendees, including minor children. Video of the incident shows Rivas punching a person who was already in handcuffs and detained by another officer. At least fifteen Galveston Police officers responded to or were present during the encounter; none intervened to stop Rivas. Among the responding officers were Officers McNeil and Spillman – both later named as defendants in the *Hardman* litigation – and Officer Gainer, later named as a defendant in *Lewis v. City of Galveston*, No. 3:25-cv-00384 (S.D. Tex. filed Nov. 25, 2025).

101. Rivas was placed on indefinite suspension on July 6, 2024 – after video of the incident circulated publicly and attracted national media coverage – and was subsequently indicted by a Galveston County grand jury on two counts of felony injury to a child and one count of felony unlawful restraint of a minor, along with four misdemeanor assault charges and a misdemeanor official oppression charge. Those prosecutions remain pending in the 56th District Court of Galveston County – the same court in which the charges against Plaintiff were later no-billed. No officer who stood by during Rivas's assaults is known to have been disciplined.

102. The sequence is itself probative of the custom: within the Galveston Police Department, accountability for force follows public exposure, not internal reporting.

Rivas's 2022 force against Ms. O'Brien, captured on video but not publicized, produced no discipline. His 2023 choking and head-slamming of Craig Bowie, with a false arrest the District Attorney dismissed seven months later, produced no discipline. His 2024 assaults at Island Bay, once viral, produced termination and indictment. Three incidents, no accountability until a camera phone made it impossible to ignore. That is the operational meaning of the reporting custom this District identified in *Backe* – deficient reporting and review of force "facilitate, mask, and even encourage" its use.

103. On June 26, 2025 – twenty-three days before the violation of Plaintiff's rights – Galveston Police officers participating in a warrant operation used force against and dangerously restrained Jahnee Dougherty, a pregnant woman, and delayed her access to medical care (GPD Case No. 25-003693). The events of July 19, 2025 followed within the month.

104. Beaumont's own paperwork in Plaintiff's case reflects the same institutional expectations: a fifty-minute body-camera failure during a major use of force dismissed in an official report as a "common occurrence"; a supplemental report identifying the wrong person as the arrestee, approved by a supervisor within approximately an hour; and felony affidavits omitting that the subject of the "controlled technique" was handcuffed. An officer writes reports like these only in a department where he expects them to be accepted. They were.

## V.     CLAIMS FOR RELIEF

**COUNT I – Unreasonable Seizure and False Arrest – Fourth Amendment, 42 U.S.C. § 1983 (*Against Beaumont*)**

105.   Plaintiff incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

106.   Beaumont physically seized Plaintiff – handcuffing her hands behind her back – before announcing any basis for the arrest. The public-intoxication charge was announced only after the seizure was already complete. Conduct or conditions observed after a warrantless seizure cannot retroactively supply the probable cause for that seizure. See *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (probable cause is measured by the facts and circumstances within the officers' knowledge 'at the moment the arrest was made'); *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204–05 (5th Cir. 2009).

107.   Even evaluating the circumstances as they existed before the seizure, Beaumont lacked probable cause. Texas Penal Code § 49.02(a) requires both intoxication and that the person "may endanger the person or another." Plaintiff was standing in a hotel hallway with her companion. She had called 911 to report an unattended child and had remained with that child pending a response. She was not stumbling, falling, threatening anyone, or presenting any observable risk of self-harm or harm to others. No articulable facts before the seizure satisfied the endangerment element of the charged offense.

108.   Alternatively, and independently, Beaumont's seizure was precipitated directly by

Plaintiff's protected verbal objections and her request that he identify himself. Plaintiff's protected verbal objections could not themselves supply probable cause for any offense. *City of Houston v. Hill*, 482 U.S. 451, 462–63 (1987). As the Supreme Court has explained, "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Id.* at 462–63. And because no probable cause supported the seizure, its retaliatory character violated the First Amendment as well. *Nieves v. Bartlett*, 587 U.S. 391, 404 (2019).It was clearly established well before July 19, 2025 that an officer may not seize and arrest a citizen absent probable cause specific to each element of the charged offense. *Freeman v. Gore*, 483 F.3d 404, 411–14 (5th Cir. 2007). Beaumont is not entitled to qualified immunity and is liable to Plaintiff in his individual capacity.

**COUNT II – Excessive Force – Fourth Amendment, 42 U.S.C. § 1983 (*Against Beaumont*)**

109. Plaintiff incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

110. Beaumont used two distinct applications of objectively unreasonable force against Plaintiff: (1) the face-first takedown of a handcuffed, non-resisting woman onto a concrete floor, and (2) the closed-fist strike to her already-fractured face after she regained consciousness. Each application of force was objectively unreasonable under the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Barnes v. Felix*, 605 U.S. 73 (2025).

111. As to the takedown: it was clearly established long before July 19, 2025 that an officer may not use a violent takedown against an arrestee who is restrained and not actively resisting. See *Trammell v. Fruge*, 868 F.3d 332, 340–43 (5th Cir. 2017) (denying qualified immunity where officers tackled a suspected public-intoxication arrestee whose only resistance was pulling an arm away); *Bush v. Strain*, 513 F.3d 492, 501–02 (5th Cir. 2008) (denying qualified immunity where officer slammed the head of a handcuffed, non-resisting arrestee into a hard surface); *Darden v. City of Fort Worth*, 880 F.3d 722, 731–33 (5th Cir. 2018).

112. As to the closed-fist strike: it was equally clearly established that once a suspect is restrained and subdued, continued force is excessive. See *Cooper v. Brown*, 844 F.3d 517, 522–24 (5th Cir. 2016); *Timpa v. Dillard*, 20 F.4th 1020, 1034–35 (5th Cir. 2021) (continued force against a restrained and subdued subject violates clearly established law).

113. Beaumont's own department had already written down the standard he violated. The Department's Use of Force policy requires officers to weigh "the degree to which the individual has been effectively restrained and his/her ability to resist despite being restrained" and "whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat," Policy 300.3.2(h), (p), and directs officers to use de-escalation "to decrease the intensity of a situation" and "reduce the need for force" where circumstances reasonably permit, Policy 300.3.5. Plaintiff was handcuffed, offering no physical resistance, and responding to nothing more than her own verbal frustration. Beaumont's internal policy, no less than the

Constitution, called for de-escalation; he supplied a takedown and, minutes later, a closed fist.

114. The force did not end when Plaintiff hit the floor. By misrepresenting Plaintiff's condition to EMS and directing her into a full-body restraint device and its accompanying chemical restraint protocol, Beaumont extended his physical control over Plaintiff through third parties after any conceivable justification for force had ended, and did so through a material misrepresentation of the clinical condition he himself had caused.

115. Beaumont's conduct violated Plaintiff's clearly established Fourth Amendment rights, and no reasonable officer could have believed either application of force was lawful. Beaumont is not entitled to qualified immunity and is liable to Plaintiff in his individual capacity.

**COUNT III – Failure to Intervene and Deliberate Indifference to Serious Medical Need – Fourth and Fourteenth Amendments, 42 U.S.C. § 1983 (*Against Zamora*)**

116. Plaintiff incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

117. Zamora personally observed Beaumont's warrantless seizure of Plaintiff and both applications of force described above. He was within arm's reach of Beaumont during the takedown, participated in the transport that followed, and stood beside Beaumont at the moment of the closed-fist strike. The interval between the two applications of force, spanning several minutes and the elevator transport to the ground floor, afforded Zamora time to assess what he had witnessed and to act on

it.

118. Zamora nonetheless took no step to intervene. He did not restrain Beaumont, interpose himself, summon a supervisor, or attempt de-escalation, although each of those measures was available to him. His failure proximately caused or contributed to Plaintiff's injuries, including the closed-fist strike that followed, by minutes, the takedown he had just witnessed.

119. Zamora's failure was twofold under his own department's written policy. The Department's Use of Force policy requires an officer who observes force "clearly beyond that which is objectively reasonable" to "intercede," and separately requires an officer who observes force "potentially beyond that which is objectively reasonable" to "report these observations to a supervisor as soon as feasible" – a reporting duty independent of the duty to intervene. Policy 300.2.1. Zamora did neither.

120. It has been clearly established in this Circuit for decades that an officer who is present at the scene and has a reasonable opportunity to realize the excessive nature of force being used and to intervene to stop it, yet fails to do so, is liable under § 1983. *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995); *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013); *Joseph v. Bartlett*, 981 F.3d 319, 343 (5th Cir. 2020).

121. Zamora's liability under this Count is not limited to his passive failure to intervene. After the takedown rendered Plaintiff unconscious, Zamora became an affirmative actor in the violation of her constitutional rights. He physically participated in moving Plaintiff's unconscious, handcuffed body before EMS arrived – handling

her by her restrained arms in violation of GPD Policy 429.4 – and he failed to provide EMS with accurate information about the mechanism of injury and her loss of consciousness, as independently required by GPD Policy 429.3. These affirmative acts and omissions placed Plaintiff at risk of additional physical harm and contributed to the clinical mismanagement of a head-trauma patient at the scene and upon EMS handoff.

122. The Fourteenth Amendment prohibits deliberate indifference to the serious medical needs of a person in custody. *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc). Zamora was aware of facts from which a substantial risk of serious harm to Plaintiff could be drawn – he witnessed the face-first impact onto concrete, he observed her lose consciousness, and he was present when Beaumont radioed in a head injury – and he took affirmative steps that aggravated rather than mitigated that risk. Moving an unconscious trauma patient by her restrained arms, in violation of an explicit departmental policy prohibition, and withholding the mechanism of injury from EMS, are not reasonable responses to a known medical emergency. They reflect deliberate indifference to Plaintiff's serious medical need.

123. Zamora is not entitled to qualified immunity and is liable to Plaintiff in his individual capacity.

**COUNT IV – Malicious Prosecution – Fourth Amendment, 42 U.S.C. § 1983 – (*Against Beaumont*)**

124. Plaintiff incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

125. A Fourth Amendment malicious-prosecution claim is cognizable under § 1983 in this Circuit. *Thompson v. Clark*, 596 U.S. 36 (2022); *Armstrong v. Ashley*, 60 F.4th 262, 278–79 (5th Cir. 2023).

126. Beaumont caused the institution and continuation of felony criminal proceedings against Plaintiff for two counts of assault on a peace officer. He initiated those proceedings personally: he swore the September 19, 2025 probable-cause affidavits on which both felony charges and the resulting arrest warrants issued, and the narrative sworn in those affidavits was his own account of an encounter in which he was the principal actor. And he continued those proceedings by allowing that account to stand uncorrected from the issuance of the warrants until the grand jury returned its no-bills on May 13, 2026, never disclosing that the takedown his affidavits described as an assault upon him was inflicted on a woman who was handcuffed behind her back and rendered unconscious.

127. Those proceedings were instituted without probable cause. The sworn affidavits supporting the felony warrants misidentified the person arrested, omitted that Plaintiff was handcuffed at the time of the takedown that Beaumont himself caused, omitted that she was rendered unconscious as a result, and omitted the extended failure of Beaumont's own body camera during the events described.

128. Beaumont acted with malice, as reflected by, among other things, his own use of unjustified force against Plaintiff, the content and timing of the affidavits he swore some sixty-two days after the incident, and the material omissions described above, which operated to shift responsibility for the injuries Beaumont inflicted onto the

woman he injured.

129. Beaumont's account of the encounter predates every sworn instrument in this case. Within minutes of the takedown, while Plaintiff was still unconscious, Beaumont told responding EMS personnel that Plaintiff had been combative. He did not tell them that she was handcuffed behind her back when she went to the ground, that her face struck the concrete, or that the impact rendered her unconscious. That account accompanied Plaintiff through the EMS handoff: the UTMB triage notes, entered within hours of the takedown and hours before the first sworn instrument issued, records her injuries as sustained "after she assaulted 2 police officers." The affidavits Beaumont swore on September 19, 2025 repeat the same account and the same omissions.

130. The felony prosecution resulted in a Fourth Amendment seizure of Plaintiff, including the issuance and nearly eight-month pendency of felony arrest warrants against her and the restraints on her liberty attendant to the criminal proceedings.

131. Both felony charges were no-billed by a Galveston County Grand Jury on May 13, 2026, terminating the prosecution without a conviction. This constitutes a favorable termination. *Thompson*, 596 U.S. at 49.

132. Plaintiff suffered injury as a result of the malicious prosecution, including the deprivation of liberty attendant to the outstanding warrants and the criminal proceedings, emotional distress, reputational harm, and attorney's fees and costs incurred in defending against the felony charges.

133. Beaumont is not entitled to qualified immunity because it was clearly established

that an officer may not procure an arrest warrant through an affidavit containing material misrepresentations or omissions made knowingly or with reckless disregard for the truth, *Franks v. Delaware*, 438 U.S. 154 (1978); *Winfrey v. Rogers*, 901 F.3d 483, 494 (5th Cir. 2018); *Melton v. Phillips*, 875 F.3d 256, 264 (5th Cir. 2017) (en banc); *Hart v. O'Brien*, 127 F.3d 424, 448 (5th Cir. 1997), and because no intermediary's probable-cause determination breaks the causal chain where, as here, the intermediary's deliberations were tainted by those misrepresentations and omissions, *Hand v. Gary*, 838 F.2d 1420, 1427–28 (5th Cir. 1988).

**COUNT V – First Amendment Retaliation – 42 U.S.C. § 1983 (*Against Beaumont*)**

134. Plaintiff incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

135. Plaintiff engaged in constitutionally protected expression throughout the encounter: she verbally objected to the officers' refusal to identify themselves and to the attempted removal of the child before the child's parents were located; she asked a police officer to identify himself; and she verbally protested her own treatment while restrained. The First Amendment protects verbal challenges and objections directed at police officers. *City of Houston v. Hill*, 482 U.S. 451, 461–63 (1987). As the Supreme Court has explained, '[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.' *Id.* at 462–63.

136. Each unconstitutional act described above followed immediately upon – and in response to – Plaintiff's protected expression. Her objection to the child's removal and her requests that Beaumont identify himself were answered with "You're about to go to jail" and a warrantless arrest. Her verbal protests while handcuffed were answered with "I'll do that" and a face-first takedown onto concrete. Her cry upon regaining consciousness – "Why are you squeezing me so hard? What are you afraid of?" – was answered with a closed fist to her fractured face.

137. Beaumont's escalation occurred immediately after Plaintiff's objection, and his words and actions reflected anger at her refusal to defer to his authority. Beaumont's own contemporaneous statements – "You're about to go to jail" spoken in response to Plaintiff's objection, and "I'll do that" spoken in response to Plaintiff's words and immediately preceding the takedown – are direct evidence that Plaintiff's protected expression was a substantial and but-for cause of each adverse action. Each of these exchanges, and Plaintiff's words in the moments before the closed-fist strike, was captured on the body-worn camera audio of both officers. Arrest, a violent takedown, and a closed-fist strike would each chill a person of ordinary firmness from continuing to engage in protected expression. *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

138. Because Beaumont lacked probable cause to arrest Plaintiff, her retaliatory-arrest claim satisfies the requirement of *Nieves v. Bartlett*, 587 U.S. 391, 404–07 (2019). Her retaliatory-force claims are subject to no probable-cause requirement at all.

139. But for Plaintiff's verbal objections and insistence that the officers identify

themselves before removing the child, Beaumont would not have seized and arrested her at that time. Even if probable cause could be asserted in hindsight, the circumstances fall within the narrow retaliatory-arrest exception recognized in *Nieves*, 587 U.S. at 407, because similarly situated persons who were intoxicated but not engaged in protected speech were not ordinarily arrested under the circumstances presented here. Alternatively, Beaumont's seizure and arrest were substantially motivated by Plaintiff's protected speech and not by any legitimate enforcement need – Beaumont arrested Plaintiff, handcuffed her, and used force in direct response to her speech and her refusal to submit to his unauthorized demands.

140. The risk that a Galveston Police officer would use force against a citizen in direct response to protected speech was not novel on July 19, 2025. As set forth in Section IV.K above, the judicial record of this District includes a detailed recitation of three incidents in 2022 and 2023 – including one in which Lieutenant Caldwell deployed OC spray, a taser, and projectile munitions against a citizen filming from his own driveway – in which Galveston officers responded to protected observation of or verbal challenge to police conduct with immediate force and arrest. *Rebmann v. City of Galveston*, No. 3:24-cv-00155 (S.D. Tex.). That documented history put the City on notice that its officers were using force and arrest as instruments to discourage protected speech – the same conduct Beaumont committed against Plaintiff twenty-five months later.

141. It was clearly established long before July 19, 2025 – and has been since at least 1987 – that a police officer may not arrest or use force against a citizen in retaliation

for protected speech. *Hill*, 482 U.S. at 462–63; *Keenan*, 290 F.3d at 258–62. That right has been confirmed in a final post-trial judgment of this District entered months before this Complaint was filed. *Pulliam v. Fort Bend County*, Civil Action No. 4:22-cv-04210, slip op. (S.D. Tex. Mar. 26, 2026) (Hanks, J.) (following bench trial, finding First Amendment retaliation where officer's arrest was "motivated by Rollins's hostility towards the content of Pulliam's speech" and was "in retaliation for the exercise of his First Amendment rights of free speech as a citizen" and "to discourage this speech based on its content," and rejecting qualified immunity). Beaumont is not entitled to qualified immunity and is liable to Plaintiff in his individual capacity.

## COUNT VI – Municipal Liability – *Monell v. Department of Social Services*, 436 U.S. 658 (1978) (*Against the City of Galveston*)

142. Plaintiff incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

143. Municipal liability under § 1983 requires a policymaker, an official policy or persistent custom, and a violation of constitutional rights whose moving force is that policy or custom. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001); *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc). Each element is satisfied here.

144. **Final policymaker.** Chief Balli was the final policymaker for the Galveston Police Department with respect to use-of-force policy, supervision, discipline, and training, and the decisions and omissions of this final policymaker constitute the

policy of the City. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

145. **Custom.** The City maintained a persistent custom of using force against restrained or non-threatening persons and of failing to require accurate, complete force reporting, which together foreseeably concealed unconstitutional force and encouraged repetition. As set forth in Section IV.K above, the City of Galveston maintained two persistent, mutually reinforcing customs within its Police Department: a custom of using excessive force against restrained or non-threatening persons – frequently triggered by nothing more than a citizen's verbal objection, request that an officer identify himself, or effort to record police conduct – and a custom of underreporting, misreporting, and failing to record uses of force. The first custom runs from the documented force against handcuffed and subdued arrestees at the H2O incident in 2008, through the three incidents recited in this District's judicial record in *Rebmann v. City of Galveston* – including Lieutenant Caldwell's own force involving OC spray, a taser, projectile munitions, and closed-fist strikes used on a citizen filming from his own driveway in January 2023 – through the 2022 takedown of Layla O'Brien after she verbally objected to officers' questioning, through Officer Rivas's July 2023 choking and head-slamming of Craig Bowie after Bowie verbally disputed a false animal cruelty allegation, through Lieutenant Caldwell's 2024 seizure of an elderly man by the neck after the man asked for his name and badge number, through Officer Rivas's 2024 punching of a handcuffed detainee at Island Bay, to Beaumont's takedown of and closed-fist strike upon the

handcuffed Plaintiff after she asked him to identify himself. The second runs from the reporting failures catalogued in this District's *Backe* appendix, through Lieutenant Caldwell's disciplinary record for use-of-force reporting violations in 2009, 2013, and 2023 – including Caldwell's failure to activate his body camera during both March 2023 force incidents, documented in the City's own disciplinary letter – through the absence of any Caldwell body-camera footage of the force used inside the residence in the June 2024 *Hardman* incident, to the fifty-minute camera failure, misidentified arrestee, and omission-laden affidavits in Plaintiff's own case. Both customs departed from the Department's own written Use of Force policy at every step: from the duty to weigh a subject's restraint before applying force, Policy 300.3.2(h), to the duty to document force "promptly, completely, and accurately," Policy 300.5, to the duty of supervisory review, Policy 300.7. These incidents share the specific similarity the law requires: force against persons who were restrained, non-threatening, or merely exercising protected speech – accompanied, in every incident where the Department's own paperwork has come to light, by reporting and recording failures that concealed the force used. This custom was a moving force behind Plaintiff's injuries because it permitted officers to escalate force against a handcuffed, non-resisting person without meaningful supervision or accountability. The reporting custom was a moving force because it concealed the first custom, prevented timely discipline, and allowed officers to believe such conduct would not be corrected.

146. **Policymaker knowledge.** The City's final policymaker for law enforcement had personal, first-hand knowledge of both customs. Chief Balli's own OC-spray deployments against a handcuffed arrestee and a subdued man at the H2O incident appear in the *Backe* court's appendix of deficiently reported force; he thereafter commanded the Office of Professional Standards, the very unit charged with policing those customs; and as Chief he personally administered the discipline that perpetuated them. By virtue of prior litigation, internal discipline, and recurring annual review obligations under departmental policy, the City and its final policymaker had actual or constructive notice that officers were using force against restrained persons and failing to accurately report it. A policymaker's own decisions and acquiescence constitute municipal policy. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986).

147. Structural notice. The City's own policy assured that this knowledge was not incidental. Department policy requires the Office of Professional Standards to prepare, "at least annually," a report identifying "trends in the use of force by members" and "training needs recommendations," to be "submitted to the Chief of Police." Policy 300.9. Chief Balli commanded that office before becoming Chief and has been the policy-designated recipient of those reports since. The customs described above were accordingly not merely knowable to the City's final policymaker; the Department's own policy required them to be identified and placed on his desk.

148. Ratification and deliberate indifference. In August 2023, Chief Balli imposed a

fourteen-day suspension – not the termination the Department's own 2013 disciplinary letter had expressly warned would follow – on Lieutenant Caldwell for three incidents including misreporting his Byrna-launcher deployments as a single OC-spray use and, critically, failing to activate his body camera during both use-of-force incidents. That documented, City-acknowledged camera failure by a supervisory officer during force is the direct institutional predecessor of Beaumont's camera failure during the force used against Plaintiff. One month earlier, in July 2023, Officer Rivas had choked Craig Bowie, slammed his head into a patrol car window twice, and made a false arrest – all without discipline. By December 6, 2023, the Galveston County District Attorney had formally dismissed all charges against Bowie, providing the City with direct notice that Rivas had made a baseless arrest contradicted by his own body camera. The City took no disciplinary action against Rivas after receiving that notice. Caldwell was retained in supervisory command and, ten months after his 2023 discipline, supervised the warrantless entry now at issue in the *Hardman* litigation. He was subsequently permitted to resign from the Department rather than being separated for cause – a departure that left no termination on his record despite three documented suspensions spanning fifteen years and active federal litigation arising from his conduct as a supervisory officer. No officer who failed to intervene during the Rivas assaults of June 25, 2024 is known to have been disciplined. Prior suspensions and warnings did not alter the Department's conduct, demonstrating that discipline was ineffective and that unconstitutional force and underreporting were tolerated within the command

structure. Despite repeated notice of these practices, the City's final policymaker ratified inadequate reporting and discipline by approving deficient reports, retaining involved supervisors, and failing to implement corrective training reasonably calculated to prevent recurrence. The message this pattern of decisions communicated to line officers – that force against restrained or disputing citizens, if unrecorded or underreported, carries no professional consequence, and that accountability arrives only upon public exposure – was received by Sergeant Beaumont, whose own report characterized a fifty-minute camera failure during a major use of force as a "common occurrence."

149.   **Failure to train.** The City additionally failed to train its officers on the elementary and foreseeable danger of applying a forceful takedown maneuver to a subject whose hands are secured behind her back – a risk so obvious that the failure to train against it reflects deliberate indifference. The City's training regimen was inadequate because it did not reasonably train officers on the constitutional limits of force against handcuffed or unconscious persons, duties to intervene, or truthful reporting and documentation obligations. The Department's own written policy commits it to periodic officer training on "[d]e-escalation tactics, including alternatives to force," Policy 300.8, and requires officers to weigh a subject's restraint before applying force, Policy 300.3.2(h); Beaumont's conduct demonstrates that this training either was not provided or was not enforced. *City of Canton v. Harris*, 489 U.S. 378, 390 & n.10 (1989); *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407–10 (1997).

150. The City likewise failed to train its officers on the medical-aid obligations its own manual imposed. Policy 429.4's directive that officers not transport unconscious persons is not a nuanced or judgment-intensive rule; it is a categorical instruction, and two officers violated it simultaneously, without hesitation and without any documented supervisory intervention, while Policy 429.3 required disclosures to EMS that Beaumont inverted. That officers of the Galveston Police Department could depart from the Department's clearest written medical-aid directives in a single encounter – and that no supervisor identified any of it – evidences a failure to train on and enforce those directives amounting to deliberate indifference. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

151. **Moving force.** These customs, the policymakers' knowledge and ratification of them, and the training failures described above were moving forces behind the constitutional violations committed against Plaintiff. Beaumont used gratuitous force against a handcuffed woman and papered over it with deficient reports and omission-laden affidavits because the Department in which he served had taught him, through fifteen years of documented practice, that this is how such incidents are handled. As a direct and foreseeable result of these customs, Plaintiff was subjected to unconstitutional force, delayed medical handling, and false criminal accusations. The City's deliberate indifference caused Plaintiff's injuries and damages.

**COUNT VII – Deliberate Indifference to Serious Medical Needs – Fourteenth Amendment, 42 U.S.C. § 1983 (*Against Beaumont and Zamora*)**

152. Plaintiff incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

153. As an arrestee in the custody of Beaumont and Zamora, Plaintiff had a clearly established right under the Due Process Clause of the Fourteenth Amendment to reasonable medical care for serious medical needs of which the officers were subjectively aware. *Hare v. City of Corinth*, 74 F.3d 633, 639, 650 (5th Cir. 1996) (en banc); *Nerren v. Livingston Police Dep't*, 86 F.3d 469, 473 (5th Cir. 1996) (an arrestee detained after a seizure but before booking has the same Fourteenth Amendment due process right to medical attention as a pretrial detainee).

154. Plaintiff's medical needs were serious and obvious, and the officers' knowledge of them was not inferential: they caused the injuries themselves. Both officers watched Plaintiff strike a concrete floor face-first while handcuffed and saw her lose consciousness. Beaumont's own radio transmission acknowledged a head injury. No reasonable officer could have failed to draw the inference of a substantial risk of serious harm – including head and spinal injury – from those facts, and both officers drew it: Beaumont summoned EMS for a head injury.

155. With actual knowledge of that risk, the officers disregarded it. They moved Plaintiff's unconscious body rather than immobilizing her and awaiting EMS, contrary to the spinal motion restriction standard and their department's written policy. Beaumont then withheld from the responding medical personnel the

mechanism of Plaintiff's injuries and her loss of consciousness, and substituted a false characterization – combative – that redirected her medical management toward physical and chemical restraint rather than the trauma precautions her actual condition required.

156. The officers' conduct delayed and distorted Plaintiff's medical care: cervical immobilization that should have preceded any movement was not applied until fourteen minutes after her arrival at UTMB; she was transported in a full-body restraint device, chemically sedated on the strength of a false clinical picture; and the risk of aggravation of her head, spinal, and orthopedic injuries was substantially and needlessly increased. This conduct amounted to deliberate indifference to Plaintiff's serious medical needs and proximately caused injury and damages to Plaintiff.

157. It was clearly established well before July 19, 2025 that an officer who is subjectively aware of an arrestee's serious medical need may not disregard it by delaying, denying, or interfering with medical care. *Hare*, 74 F.3d at 650; *Nerren*, 86 F.3d at 473; *Dyer v. Houston*, 964 F.3d 374, 380–84 (5th Cir. 2020). Neither Beaumont nor Zamora is entitled to qualified immunity, and each is liable to Plaintiff in his individual capacity.

## VI.    STATE-LAW CLAIMS (PLED IN THE ALTERNATIVE)

158. Plaintiff incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

159. To the extent not barred by official immunity or other defenses, Plaintiff pleads, in

the alternative, Texas common-law claims against Beaumont and Zamora individually – and against no other Defendant – for assault, battery, false imprisonment, malicious prosecution, and negligence, arising from the same conduct described above.

160. Beaumont's takedown and closed-fist strike constituted intentional, harmful, and offensive contact without Plaintiff's consent and without legal justification, satisfying the elements of assault and battery under Texas law.

161. Plaintiff's warrantless detention without probable cause constituted false imprisonment under Texas law.

162. Zamora is liable for these intentional torts on the basis of his own conduct. Zamora personally participated in Plaintiff's detention and physical handling: he helped move Plaintiff's unconscious, handcuffed body by her restrained arms, conduct consistent with the bilateral arm ecchymosis documented in the UTMB trauma examination, and he participated in maintaining the warrantless detention that constituted false imprisonment.

163. Zamora's affirmative participation in moving Plaintiff's unconscious body before EMS arrived, in violation of GPD Policy 429.4, and his failure to provide EMS with accurate information about the mechanism of injury and Plaintiff's loss of consciousness, in violation of GPD Policy 429.3, constitute common-law negligence independent of and in addition to his liability for the intentional torts described above. Under Texas law, once Zamora exercised physical custody over an injured person in custody, he owed a duty of reasonable care with respect to that

person's medical condition, and he breached it.

## VII.  DAMAGES

164. As a direct and proximate result of Defendants' conduct described above, Plaintiff has suffered and will continue to suffer: a nondisplaced fracture of the left maxilla requiring specialist follow-up and dental extraction; a fractured left second premolar; bilateral periorbital hematomas and facial soft tissue injury; an intra-articular lateral tibial plateau fracture requiring non-weight-bearing status, a hinged knee brace, and orthopedic follow-up; common peroneal nerve palsy with foot drop requiring a left ankle-foot orthosis, the permanent or long-term nature of which remains subject to medical evaluation; loss of consciousness and head trauma requiring trauma activation and a 41-hour hospitalization; the application of a full-body restraint device and chemical sedation administered on the basis of a false account of her condition; bilateral arm ecchymosis consistent with forcible handling while restrained; past and future medical expenses; physical pain and suffering; mental anguish and emotional distress, including trauma arising from the use of force by a law enforcement officer and a subsequent felony prosecution; disfigurement; impairment of mobility and function; lost income and earning capacity; reputational harm; and attorney's fees and costs incurred in the defense of a malicious felony prosecution and in this proceeding.

165. Plaintiff seeks compensatory damages in an amount to be determined at trial, punitive damages against the individual Defendants in their individual capacities, attorney's fees and costs under 42 U.S.C. § 1988, and pre- and post-judgment

interest as allowed by law.

## VIII.  **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiff Brandy Lee Vandenberg respectfully requests that Defendants City of Galveston, Texas, Sergeant Liam Beaumont, and Officer C. Zamora be cited to appear and answer herein, and that upon final trial Plaintiff recover judgment against Defendants, jointly and severally where permitted by law, for:

a.      Compensatory damages;

b.      Punitive damages against the individual Defendants;

c.      Pre-judgment and post-judgment interest as allowed by law;

d.      Attorney's fees and costs of court pursuant to 42 U.S.C. § 1988; and

e.      Such other and further relief, at law or in equity, to which Plaintiff may show herself justly entitled.

## IX.    **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Date: 07/27/2026                                    Respectfully submitted,

<table>
<tr>
<td>

*/s/Courtney A. Vincent*
**Courtney A. Vincent**
Minnesota Bar No. 0403083
SDTX Bar No. 3746531
**info@vincentlawpllc.com**
*Vincent Civil Rights –*
*a Division of Vincent Law, PLLC*
1035 Dairy Ashford, Suite 145

</td>
<td>

*/s/ Adalberto E. Ruiz*
**Adalberto E. Ruiz**
Texas Bar No.
SDTX Bar No.
**alberto@ruizlawyer.com**
*Ruiz Law Firm, PLLC*
3718 E. Broadway Street
Pearland, Texas 77581

</td>
</tr>
</table>

Houston, Texas  77079
**Mailing Address:**
P.O. Box 940129
Houston, Texas  77094
Tel: (713)223-9300
Fax: (832)603-4444
**LEAD COUNSEL FOR PLAINTIFF**

Tel: (713) 234-7894
Fax: (832) 408-8540
**CO-COUNSEL FOR PLAINTIFF**

## EXHIBIT LIST

**Exhibit A**    No-Bill Closure Notice, Cause No. 25-CR-3867 (Galveston County

Criminal District Attorney, filed May 13, 2026)

**Exhibit B**    No-Bill Closure Notice, Cause No. 25-CR-3869 (Galveston County

Criminal District Attorney, filed May 13, 2026)

**Exhibit C**    Representative Photograph of Plaintiff's Injuries

**Exhibit D**    Photographs Depicting Plaintiff's Injuries and Her Condition in Custody

(Collage)